**James MIMS, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 15654.**

United States Court of Appeals
Ninth Circuit.

March 28, 1958.

Minsky & Garber, Bernard W. Minsky, Robert Barnett, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Ronald Rosen, Lloyd F. Dunn, David B. Schefrin, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before FEE, CHAMBERS and BARNES, Circuit Judges.

BARNES, Circuit Judge.

Appellant was convicted by a jury of an illegal sale of narcotics (21 U.S.C.A. § 174). He urges reversal because:

(1) The District Court failed to instruct the jury that the testimony of (a) an accomplice, and (b) a perjurer, not an accomplice, must be viewed with extreme caution;

(2) The District Court refused to allow appellant "to inquire into the business relationship" between appellant and the father of his alleged accomplice.

We fail to find either ground a valid basis for reversal.

*I. Testimony of an Accomplice.*

■ As to the first ground, appellant's then counsel (not representing him on this appeal) failed to request any specific instruction on the subject. This is conceded in appellant's brief. Having so failed, counsel cannot now claim error. This we have repeatedly held. Zamloch v. United States, 9 Cir., 1952, 193 F.2d 889, 892; Himmelfarb v. United States, 9 Cir., 1948, 175 F.2d 924, 926, 944. The case of Freed v. United States, 1920, 49 App.D.C. 392, 266 F. 1012, cited by appellant is not apposite, for there the instruction was requested and refused, and the short general admonition given properly held insufficient.

The Supreme Court considered this same problem (the necessity of instructions to the jury that testimony of accomplices are to be received with great caution and believed only when corroborated by other material testimony adduced in the case) in an appeal from this Court in the famous Diggs and Caminetti cases, Caminetti v. U. S. (Diggs v. U. S.) 1917, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442. There this Court has held, 9 Cir., 1915, 220 F. 545, 552, that a refusal to instruct as to the value of the testimony of an accomplice is not error for which a judgment should be reversed. This despite the fact that in Holmgren v. United States, 1910, 217 U.S. 509, 30 S.Ct. 588, 54 L.Ed. 861, the Supreme Court had stated it was "the better practice" to so instruct. In 1915, this Court recognized that while it might well be the better practice, "no court, state or federal, has held that it is reversible error to refuse to caution the jury." 220 F. at page 552.

In Holmgren, supra, a specific instruction on the subject was requested. However, it was not in proper form, for it named the alleged accomplice, as such. The fact of the witness being an accomplice was in dispute at the trial. In the Diggs and Caminetti cases the instruction requested was in proper form, leaving the finding as to whether either of the persons involved were accomplices to the jury, and requesting the admonition of care and caution to be applicable only after such finding. The instruction was refused. This Court held the general instructions given were sufficient[1] and that there was no error. In reviewing the matter and in affirming this Court's holding of no error in the trial court's refusal of the instruction offered, the Supreme Court (242 U.S. 470, 495, 37 S.Ct. 192, 198) cited the Holmgren case and stated that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them."

Not only was no specific instruction on the subject requested in this case, but no objection or exception was taken at the conclusion of the judge's charge to the jury by reason of his failure to so in-

---

[1] "* * * That they (the jury) should take into consideration the character and conduct of each witness, his relation to the controversy and to the parties, his expressed or apparent bias or partiality, the reasonableness or unreasonableness of the statements he makes, and all other elements which tend to throw light upon his credibility." 220 F. 545, 553.

struct. An objection was required by Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A.[2]

■ But appellant urges that this is the type of error that should be noticed by an appellate court in the public interest, irrespective of any failure of counsel to object. He relies on the doctrine enunciated in United States v. Atkinson, 1936, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555, where "exceptional circumstances" prevailed, and United States v. Perplies, 7 Cir., 1948, 165 F.2d 874, where they did not (but where no error was found, and conviction was affirmed). Particular reliance is placed on United States v. Levi, 7 Cir., 1949, 177 F.2d 827.[3]

The test used in the Levi opinion to determine whether there was harmless or reversible error was a quotation from the Kotteakos case:[4]

"' * * * And the question is, not were they (the jury) right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. (Citations omitted.) * * *

"If when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. * * * But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.' " 177 F.2d at page 832.

Applying that same "substantial influence" test to the instant case, we do not find a factual background similar to the Levi case. Here instructions *were* given by the trial judge.[5] Here the testi-

2. Not only was no specific instruction on the subject offered, and no objection made to the instructions as a whole, but the defendant's counsel expressed his satisfaction with the charge given.

3. Appellee urges that this case was reversed because of an improper question asked of defendant by government counsel, and hence is not in point. That error does seem to have been most heavily relied on for reversal. The dissenting opinion, for example, treats that issue as controlling. But a fair reading of the case indicates the reversal was based in part at least on the error of the trial court in not warning the jury of the frailty of the evidence from the accomplice Ward through a cautionary instruction. The Court of Appeals for the Seventh Circuit had to determine whether that was harmless error. We conclude from our reading of the case that *both* the improper question propounded *and* the failure to give the cautionary instruction were found reversible error by that Court.

4. Kotteakos v. United States, 1946, 328 U.S. 750, 763, 764, 66 S.Ct. 1239, 90 L. Ed. 1557.

5. The Court gave, among others, the following instructions:

"* * * You have heard the witnesses, and observed them. You are expected to size up the witnesses, to measure them somewhat as to the kind of people they are and to determine whether they are the type of person in whom you would have a lack of confidence because of the inherent gross character of the witness.

"You are expected also to see whether the witness' testimony holds together in itself. Has that witness been one who has contradicted himself or herself? Has that witness at other times and places told different stories and, if so, what were the motivations.

money of the accomplice, Sabbath, and of the perjurer, Bonnie Barrett was supported and corroborated by other evidence.[6]

It is our opinion that there existed other material and substantial testimony in the case corroborating and strengthening the testimony of the accomplice Sabbath so as to make the evidence of defendant's guilt "strong" rather than "weak." There was sufficient evidence to *permit* the jury to find defendant guilty

"Consider also what the witness has to gain or lose or what the witness thinks he has to gain or lose from the testimony given in the case.

"When you consider the testimony of the defendant you measure it by the same standards as you measure the testimony of other witnesses, but you bear in mind the situation of a defendant. Likewise, you bear in mind the situations of these other witnesses.

"Sabbath, for instance, was a man who was charged in this same indictment. There are two counts, each of which would be subject to its own penalty if a defendant were convicted. The defendant Sabbath has testified to a story against the defendant Mims, and by 'story' I mean that in the sense of narrative. I am not trying to characterize it as either truth or fiction.

"Sabbath has given a narrative of the transaction, which is quite at odds with the narrative he gave of the transaction at an earlier time. There has been one charge dismissed.

"Now, does he feel, Sabbath, as he sat here on the stand, an obligation to go along with the story or narrative he gave here because of a desire to ingratiate himself with the authorities? Does he think he would do himself some good? Did he perhaps procure a dismissal of the one count by an offer to cooperate which, regardless of whether it was really an offer to cooperate, would be accepted by the Government as such, and the Government would be in the position of saying, 'Well, here we have a penitent sinner who is going to cooperate with us. Let's give him a break and dismiss one of the counts.'

"Was that the motivation of Sabbath in changing the story or was it the fact that Sabbath now is in prison and he was up here and if he testified falsely he would be subject to the pains and penalty of perjury, so he knew he had better tell the true story this time, regardless of what story he told to Richards earlier. Those are all questions which a jury will have to decide.

"If, when you decide them, you come to a frame of mind where you would say, 'Well, I am just sure about it,· that

testimony of Sabbath is amply corroborated by the other witnesses and Sabbath was right,' then there wouldn't be any reasonable doubt.

"If you think, on the other hand, that Sabbath was wrong in the testimony he gave here you wouldn't have any reasonable doubt. But, if you find yourself in that frame of mind, where you just don't know, after considering it you don't feel that conviction of one position or the other, to where you can say that it exists to a moral certainty, then you would be in a state of reasonable doubt." [Tr. pp. 216, 217, 218.]

6. There is evidence from various government agents, particularly Richards, and his testimony as to Mims' conduct at the scene of the sale and delivery of the narcotics. Mims chose to take the stand on his own behalf and told of a telephone conversation with Deacon Allen (Officer Richards) entirely contradictive of the officer's testimony; Mims told of meeting Frank Sabbath as he was moving away from Richards, *walking continuously without stopping* down the hallway outside the room where Officer Richards was sitting, and then immediately going out the back door; that that was the only time he (Mims) was in that hallway that day; that Sabbath came in from the back and Mims gave Sabbath nothing and took no money from Sabbath; that Sabbath handed him nothing. This testimony was flatly contradicted by Officer Richards, as well as by Sabbath and Barrett, and was corroborated by the officers outside and by the obvious fact that if Mims were telling the truth he never could have received back from Sabbath the keys to Mims' car which Sabbath admittedly used. Mims explained (on redirect) that the keys were unnecessary for his Buick, but telling arguments were made by government counsel on the inconsistencies between Mims' testimony and that of three officers, as well as between Mims' testimony and that of Sabbath and Bonnie Barrett.

The Supplemental Transcript of Record contains the full argument of governmental counsel.

658

beyond a reasonable doubt without the testimony of either Sabbath or Barrett, or both of them.

We find no fatal or reversible error in view of the evidence presented to the jury and the instructions actually given it.

## II. Testimony of a Perjurer

The witness Bonnie Barrett readily admitted on direct examination that she had been convicted of perjury before the grand jury. Because of this, says appellant, "the court *must* charge the jury that the testimony of such a witness must be scrutinized with care." This is so, says appellant, because "the only evidence in the case at bar, that directly connects appellant with the sale of narcotics," is the testimony of Barrett and Sabbath. We have said enough concerning the evidence above to indicate that we cannot agree with such a statement.

Further, the sole appellate court case [7] which appellant cites to support his position (which it does) says this:

"The appellant contends that because Sands was an admitted perjurer his testimony should not have been considered. Even a convicted perjurer, however, may testify competently. The jury must determine his credibility.[2] The court must charge that the testimony of such a witness must be scrutinized with care. The learned District Judge's charge was adequate."

Note 2 to the above quotation points out that that court relies on Hammer v. United States, 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118, in which "there was no evidence to corroborate the testimony of the witness who had previously committed perjury." That is not the case here, as we have pointed out above.

The Katz [8] and Segelman [9] cases in the District Court are not persuasive that plain error was committed. Katz quotes

language in United States v. Manton [10] as pertinent:

"'It is true that * * * in the main, the evidence tending to show Manton's partnership in the conspiracy came from the lips of convicted co-conspirators and other witnesses of bad or dubious character. Indeed, in a case like this, it is unlikely that it would be otherwise. But the credibility of these witnesses and the weight to be given their testimony, as we have already said, were questions for the jury and are matters beyond the scope of judicial review.'" United States v. Katz, D.C.M.D.Pa.1948, 78 F.Supp. 435, 438.

Segelman quotes the Margolis language of Judge Biggs, quoted above, and reverses the conviction because appellant was not permitted to prove the witness had been convicted of perjury. That witness (Mehlman) was not only a key witness, but "the indictment could not be sustained without his testimony." Segelman was convicted without the jury knowing that the key witness Mehlman had been convicted.

Here Barrett was no key witness. In fact, she was not called by either side at the first trial, though both knew her.

Further, here the jury knew of Bonnie Barrett's conviction of a felony from her own lips. They knew Sabbath had pleaded guilty and was an accomplice awaiting sentence. "The warning flags were up," as was stated on oral argument. We believe the court's instructions on how to judge the credibility of the witnesses were adequate, in view of all the testimony before the jury, and *no clear error was committed in the court's failure to instruct further.*

## III. Alleged Evidentiary Error.

The District Court's refusal to permit the defendant to "try" the Rev-

---

7. United States v. Margolis, 3 Cir., 1943, 138 F.2d 1002, 1004.

8. United States v. Katz, D.C.M.D.Pa.1948, 78 F.Supp. 435, 438.

9. United States v. Segelman, D.C.W.D.Pa. 1949,.83 F.Supp. 890.

10. 2 Cir., 1938, 107 F.2d 834, 843.

erend Mr. Powell, a police informant, because Mims was supposedly unhappy in engaging in business with him, is alleged to be a fatal error requiring a reversal of defendant's conviction.

We think not. Defendant was permitted to tell his "valid reason" as to why he went to the premises where the sale took place. Mr. Powell was present in the courtroom at the request of the government, though not called as a government witness. Defendant could have called him had he desired The discretion of a trial court is large as to how and when bias may be proved and what collateral evidence is material. We do not find the trial court abused that discretion. From the offer of proof in the record we find the court's exercise of its discretion wise.

The judgment is affirmed.